# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**FABRICE EBUA WALANG,**

    **Plaintiff,**

  v.

**ACTING FIELD OFFICE DIRECTOR OF ENFORCEMENT AND REMOVAL OPERATIONS, DETROIT FIELD OFFICE, IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,**

    **Defendants.**

**Case No. 1:26-cv-151**

**JUDGE DOUGLAS R. COLE**
Magistrate Judge Jolson

## OPINION AND ORDER

U.S. Immigration and Customs Enforcement (ICE) is currently detaining Petitioner Fabrice Ebua Walang pending removal proceedings. Walang filed a Petition for Writ of Habeas Corpus (Doc. 1), requesting this Court order his release. Walang argues that he is subject to 8 U.S.C. § 1226(a), which provides for individualized bond hearings, instead of 8 U.S.C. § 1225(b)(2), which mandates detention. (Doc. 1, #9). The government, however, argues that Walang is detained under 8 U.S.C. § 1225(b)(1) as an arriving alien. (Return of Writ, Doc. 4, #131–35). This Court recently addressed the question of whether § 1225(b)(2) or § 1226(a) applies to similar petitioners in *Coronado v. Secretary, Department of Homeland Security*, No. 1:25-cv-831, 2025 WL 3628229 (S.D. Ohio Dec. 15, 2025), and further explained its reasoning in *Lucero v. Field Office Director of Enforcement and Removal Operations*, No. 1:25-cv-823, 2025 WL 3718730 (S.D. Ohio Dec. 23, 2025). As relevant

here, the Court concluded that anyone who is present in the country, but who was not admitted, falls under § 1225(b)(2) rather than § 1226(a). But in reaching that result, the Court did not have occasion to discuss the contours of the § 1225(b)(1) arriving alien category, which the government contends is the category at issue here. (Doc. 4, #131–35). Beyond that, Walang's petition presents another new wrinkle—he received Temporary Protection Status (TPS) while paroled in the country, which is a lawful status. (Doc. 1, #7). Ultimately, though, the Court finds that Walang is subject to mandatory detention under § 1225(b)(1), and TPS does not alter that conclusion. Thus, the Court **DENIES** the Petition (Doc. 1).

## BACKGROUND

Walang is a citizen of Cameroon. (Doc. 1, #5). He entered the United States on December 24, 2019, at the San Ysidro, California port of entry. (*Id.* at #7). There, Walang received a Notice to Appear (NTA), wherein the Department of Homeland Security (DHS) designated him as an "arriving alien." (Doc. 1-2, #24). The NTA also charged him with violating § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA) because he did not possess proper documents. (*Id.*). At that time, DHS also conducted a credible fear interview and found that Walang "ha[d] demonstrated a credible fear of persecution or torture." (Doc. 1, #7; Doc. 1-2, #24; Credible Fear Worksheet, Doc. 1-3, #30 ("Applicant found credible.")). Although he was found

credible, DHS determined that he was barred from asylum by 8 C.F.R. 208.13(c)(4).[1] (Doc. 1-3, #31).

On May 20, 2020, ICE released Walang on a $10,000 bond. (Doc. 1, #7; Not. of Release, Doc. 4-3, #145; Parole Notification, Doc. 4-4, #146). Following his release, he moved to Ohio to live with his brother, who is a U.S. citizen. (Doc. 1, #7). Several months later, Walang applied for asylum, withholding of removal, and protection under the Convention against Torture. (*Id.*; Doc. 1-4 (application)). While that application was pending, Walang married a U.S. citizen. (Doc. 1, #7).

Almost four years after Walang applied for asylum, and while that application was still pending, Walang received Temporary Protected Status (TPS). (*Id.*). The Court will further explain TPS below. For now, as a result of obtaining TPS, on September 4, 2024, the Immigration Court "administratively closed" Walang's case at the "[j]oint request by both parties." (*Id.*; Order, Doc. 4-5, #147). Walang was still required to check-in periodically at an ICE office though. (*See* Doc. 1, #8).

What gives rise to the current petition is that, at least according to the government, Walang's TPS expired on August 4, 2025. (Doc. 4, #128). And at his most recent appointment on January 13, 2026, ICE detained Walang. (Doc. 1, #8). He has been detained at Butler County Jail ever since. (*Id.*). In the meantime, DHS has

---

[1] While the current version of the regulation reserves (c)(4), the version in effect at the time Walang entered the U.S. stated that "any alien who enters, attempts to enter, or arrives in the United States across the southern land border on or after July 16, 2019, after transiting through at least one country outside the alien's country of citizenship … shall be found ineligible for asylum." 8 C.F.R. § 208.13(c)(4) (2020). Because Walang crossed through several other countries on his path from Cameroon to the United States, (*see* DHS Record, Doc. 4-1, #141 (describing journey)), this provision rendered him ineligible.

3

moved to reopen Walang's immigration case. (*Id.*; Order, Doc. 4-6, #149). Although that motion was pending at the time Walang filed his habeas petition in this Court, the immigrant court has since granted it. (Doc. 4-6, #149).

On February 11, 2026, Walang filed this Petition for Writ of Habeas Corpus. (Doc. 1). There, he argues that the government has improperly detained him under 8 U.S.C. § 1225(b)(2), which mandates detention, when he should be detained under § 1226(a), which provides for individualized bond determinations. (*Id.* at #9). Specifically, Walang raises five claims for relief: (1) a violation of the INA's bond regulations; (2) a violation of the Administrative Procedure Act; (3) a violation of the Suspension Clause; (4) a violation of substantive due process; and (5) a violation of procedural due process. (*Id.* at #9–18). Ultimately, Walang requests immediate release from custody or, alternatively, for the Court to order an individualized custody hearing. (*Id.* at #18).

While Walang focuses his arguments on § 1225(b)(2), the government, by contrast, argues that Walang is detained under § 1225(b)(1) for expedited removal proceedings as an arriving alien. (Doc. 4, #131–35). And it claims that "[t]he fact that Petitioner was granted parole, and TPS status, does not change the fact that he is an arriving alien," subject to mandatory detention under that provision. (*Id.* at #133). The government also argues that Walang failed to exhaust his administrative remedies, which separately supports dismissal of the petition.[2] (*Id.* at #129–31).

---

[2] The Court also more fully addressed the issue of exhaustion in *Coronado*, and it held that prudential exhaustion is not required to resolve this issue. 2025 WL 3628229, at *2–6, 13.

4

Walang replied. (Doc. 7). So the matter is ripe for the Court's review.

## LAW AND ANALYSIS

The Court starts with whether § 1225(b)(1), § 1225(b)(2), or § 1226(a) applies. In general, § 1225(b)(1) provides for expedited removal proceedings for arriving aliens under certain conditions. An arriving alien means "an applicant for admission coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. If the arriving alien is inadmissible under § 1182(a)(6)(C) or (a)(7), then "the officer shall order the alien removed from the United States without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). But there is an exception for an alien who intends to apply for asylum. *Id.* In that case, the immigration officer refers the alien to an asylum officer for a credible fear interview. *Id.* § 1225(b)(1)(A)(ii). There are two paths following that credible fear interview. If the asylum officer determines that the alien has a credible fear of persecution, then "the alien shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). Otherwise, the alien shall be ordered removed without further review. *Id.* § 1225(b)(1)(B)(iii)(I). However, even if an asylum officer concludes there is no credible fear of persecution, the alien can still request prompt review by an immigration judge. *Id.* § 1225(b)(1)(B)(iii)(III). In that case, though, the statute still states that the alien "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." *Id.* § 1225(b)(1)(B)(iii)(IV). But "[w]hether an applicant who raises an asylum claim receives full or only expedited

5

review, the applicant is not entitled to immediate release." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 111 (2020).

Section 1225(b)(2)(A), on the other hand, is a "catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." *Coronado*, 2025 WL 3628229, at *9 (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018)).

Here, Walang entered the United States at a port of entry and was designated as an arriving alien. (Doc. 1-2, #24); *see* 8 C.F.R. § 1.2 (defining "arriving alien"). ICE charged Walang with violating § 212(a)(7)(i)(I) of the INA, which is codified at 8 U.S.C. § 1182(a)(7)(i)(I). (Doc. 1-2, #24). So Walang falls within the threshold conditions for § 1225(b)(1). From there, Walang claimed he had a credible fear, which the asylum officer found legitimate. (Doc. 1-3, #30). ICE, however, gave him a "negative credible fear of persecution determination" because it found Walang ineligible for asylum under 8 C.F.R. § 208.13(c)(4). (*Id.* at #31).

At first glance, there appears to be some ambiguity about how the asylum officer's initial determination of credibility fits into the statutory scheme described above. The statute, however, defines credible fear of persecution as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Stated differently, "credible fear" turns on whether the alien is eligible. In this case, even though ICE found Walang initially credible, it only matters that, at the end of the

6

day, it determined he was ineligible for asylum. ICE's ineligibility determination means Walang cannot show a cognizable credible fear of persecution.

Because ICE found Walang ineligible, Walang was subject to mandatory detention pending a final determination (by an Immigration Judge) of his credible fear of persecution claim and, depending on that result, until removal under 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Considering that § 1225(b)(1) applies, reference to § 1225(b)(2) as the catch-all provision is unnecessary. Furthermore, that also means that § 1226(a) does not govern, and therefore Walang is not entitled to an individualized bond hearing.

But what about the fact that ICE paroled Walang into the United States, rather than continuing to detain him, and later granted him TPS? Walang argues that these decisions alter his status as an arriving alien. (Doc. 7, #165). Start with the parole issue. This question is easily settled under the relevant regulations. "An arriving alien *remains an arriving alien* even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2 (emphasis added). So even though ICE did not keep Walang in custody while his removal and asylum proceedings played out, this did not change Walang's status as an arriving alien.[3] Thus, it also does not alter whether he falls under § 1225(b)(1).

---

[3] Walang's paperwork does not state under which statute he was paroled. It only states that "[u]nder ICE policy, arriving aliens determined by an Asylum Officer to have a credible fear of persecution or torture are initially considered for parole. While the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community." (Doc. 4-4, #146). The Court notes that this paperwork is in

7

Now turn to the TPS issue. The Attorney General may designate nationals of certain foreign states for TPS for many reasons, such as if there is an "ongoing armed conflict within the state" or major natural disaster. 8 U.S.C. § 1254a(b)(1). TPS provides recipients with a legal status. For example, "for purposes of adjustment of status … the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant." *Id.* § 1254a(f)(4). And the government "shall not remove the alien from the United States during the period in which such status is in effect." *Id.* § 1254a(a)(1)(A).

But, while TPS provides some protection for recipients, that protection has limits. The Supreme Court recently evaluated the effect of TPS on an alien's ability to apply for an adjustment of status to become a legal permanent resident. *Sanchez v. Mayorkas*, 593 U.S. 409, 414–415 (2021). In *Sanchez*, the Supreme Court noted that "[l]awful status and admission … are distinct concepts in immigration law: Establishing one does not necessarily establish the other." *Id.* at 415. The Court further held that the "TPS statute permits [a non-citizen] to remain in the country … But the statute does not constructively 'admit' a TPS recipient—that is, 'consider[]' him as having entered the country 'after inspection and authorization.'" *Id.* at 416 (citations omitted). And because TPS does not qualify as admission, "it does not eliminate the disqualifying effect of an unlawful entry." *Id.*

---

tension with the fact that ICE determined he had a negative credible fear determination. Regardless, though, the Court finds this policy likely falls under the Secretary of Homeland Security's discretion to parole "for urgent humanitarian reasons or significant public benefit any alien applying for admission." 8 U.S.C. § 1182(d)(5) (§ 212(d)(5) of the INA).

8

In this case, Walang argues that TPS transforms him from an arriving alien into an admitted immigrant, and so he is entitled to a bond hearing. As the Court established more fully in its opinions in *Coronado*, 2025 WL 3628229, and *Lucero*, 2025 WL 3718730, anyone who is present in the country, but who was not admitted, falls under § 1225(b) rather than § 1226(a). So Walang needs to establish that TPS qualifies as an "admission" in order to move him away from § 1225 and under § 1226(a)'s umbrella. But as the Supreme Court made clear in *Sanchez*, obtaining TPS does not qualify as admission. 593 U.S. at 416. So Walang is still an arriving alien; his status has not changed. Accordingly, TPS does not change that § 1225(b)(1) rather than § 1226(a) applies.

Lastly, Walang also raises a claim under the Suspension Clause of the Constitution. (Doc. 1, #11–14). That provision states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. "In order to successfully contest the constitutionality of [a] statute on Suspension Clause grounds, two things must be true: (1) the petitioner must be seeking 'core' habeas relief; and (2) there is no adequate substitute to effectively test petitioner's detention." *Bartolon v. Bondi*, __ F. Supp. 3d __, No. 1:25-cv-747, 2025 WL 3674604, at *3 (S.D. Ohio Dec. 18, 2025) (citing *Hamama v. Adducci*, 912 F.3d 869, 875–76 (6th Cir. 2018)). For the former, "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its

protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001) (citations omitted).

Here, the first element is simple. Walang requests an individualized bond hearing to challenge his detention, so he is "seeking core habeas relief." *Bartolon*, 2025 WL 3674604, at *3 (internal quotation marks omitted). The second element dooms his claim though. Simply put, the privilege was not suspended. To the contrary, Walang has brought a habeas claim challenging his mandatory detention before this Court, and the Court has reached the merits of that petition. Unlike challenges to a final removal order where Congress has stripped federal district courts of judicial review, this Court possesses jurisdiction to review detention-based claims. *See Coronado*, 2025 WL 3628229, at *3–5 (finding jurisdiction over detention-based claims). While there may be no "administrative mechanism" to challenge Petitioner's detention, (Doc. 7, #166), a habeas petition in a federal court remains available.

Admittedly, the government errs in relying on *Thuraissigiam* to argue that Petitioner's removal proceedings in immigration court are an adequate substitute. (Doc. 4, #136). In *Thuraissigiam*, the Supreme Court addressed a Suspension Clause claim where the petitioners sought review of their removal orders, not their detention status. 591 U.S. at 117–18. This requested relief did not fall within the "core" of habeas relief, so it did not implicate the Suspension Clause. *Id.* at 119. And the adequacy of their credible fear determinations affected the petitioners' due process claim, not the Suspension Clause. *Id.* at 138. But, although the government relies on

10

the wrong caselaw, the Court nonetheless holds that Walang's Suspension Clause claim fails. Accordingly, the Court will **DISMISS WITHOUT PREJUDICE** Walang's Petition (Doc. 1).[4]

Although the Court dismisses the Petition, it pauses once again to note that the Court is not remarking on the wisdom of mandatory detention in this context. The deluge of petitions that have inundated federal courts across the country on this topic in recent months highlight the very real personal costs that mandatory detention imposes not only on the detainee, but also their family members and loved ones. Then there are the accompanying societal costs, both the direct costs of the detention itself, and the indirect costs arising from sidelining those who might otherwise be productive members of society. At the same time, the Court is also mindful that, once released, it is always possible that a person not lawfully present in the country (especially if facing a substantial likelihood of removal) may decline to appear for future removal proceedings. And if it is difficult to predict who will appear and who will not, or to assess what dangers they pose in the interim, then perhaps there may be reasons to believe that mandatory detention pending a removal determination is appropriate.

At the end of the day, though, Congress, not this Court, is the body responsible for navigating the various competing concerns and articulating the appropriate path

---

[4] The Court dismisses without prejudice in the event that Petitioner wishes to pursue relief as a potential class member in *Bautista v. Santacruz*, No. 5:25-cv-1873, 2025 WL 3713982 (C.D. Cal. Dec. 18, 2025). Should he wish to do so, though, he should pursue any such remedy in that court, not this one.

11

forward. And, at least in this Court's view, Congress has done so in the plain language of § 1225(b)(1) and (b)(2).

That said, Congress's chosen path must also comply with the Constitution. And on that front, the Court notes that, if Congress mandates detention pending a removal determination, then the Constitution arguably imposes some obligation on the Executive to ensure that the removal determination occurs in a reasonably prompt fashion. That is, if Walang's pre-removal detention goes on too long, constitutional concerns may well arise. After all, Walang's asylum application had been pending for almost four years before he obtained TPS, which administratively closed the asylum application. (Doc. 1, #7). If Walang had been detained throughout that time, he may well have had a constitutional claim. But his current detention is of a limited duration, at least so far, so the constitutional limits on the maximum permissible duration of that detention is a question for another day. Having said that, in connection with dismissing this action, the Court **ORDERS** the government to provide this Court and Walang's counsel in writing, within fourteen days, its best current estimate as to when a determination on the question of Walang's removal will be administratively final. Once the government has provided that information, the Court, as noted above, will dismiss this petition without prejudice.

**SO ORDERED.**

March 5, 2026
 **DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**